Mr. Phillips? Good morning, Your Honors, and may it please the Court, Carter Phillips for the States is the appellant in this matter. I'd like to reserve three minutes for rebuttal. Granted. I'm going to begin with what's- Which is your firm, sir? I'm sorry, Your Honor? Which is your firm? Sidley Austin. I'd like to begin with a jurisdictional issue first, the question of sovereign immunity, because I think it shouldn't detain us long. The Court below hinted that it thought there was no waiver of sovereign immunity in this particular case. I submit to you that if you read Section 702, its plain language clearly is a waiver of sovereign immunity. We have here an action in a court of the United States, clearly we're in one of those right now, seeking relief other than money damages. The Supreme Court in Bowen v. Massachusetts made it clear that money damages means precisely that, a claim for damages, not just the fact that there is monetary relief of some sort involved here. So it seems to me we're plainly covered by Section 702. There's a waiver of sovereign immunity, and unless you have questions about that, I'm inclined to move on to the intergovernmental immunities and preemption issues. Now, this circuit has recognized that there is a confluence of concepts between intergovernmental immunities and preemption, and in some ways it makes a lot more sense for me to think about this as just a preemption case. But the intergovernmental immunities component of it, to the extent that there is an independent element, suggests that there has to be direct regulation of the federal government, and the question is what do we have in this particular situation? And I submit to you that a sheet is not either by intent or by objective or by effect direct regulation of the federal government. A sheet is designed and has been well recognized in all the Supreme Court cases dealing with a sheet, that it's aimed at dealing with the state's residents and property in their hands. It is not designed to regulate what the federal government does under these circumstances. And if you had title, there would be no dispute. They'd have no argument that you could pursue a sheet. Right, and it's very difficult to understand the distinction that they try to draw there, because if you look at the regulations, they're consistent. There are a whole slew of regulations, obviously, in 31 CFR 315 ad infinitum, and they're perfectly happy to recognize state law that serves as the basis for a notary public, for a power of attorney in order to get payment of the bonds. There is no requirement as a matter of law, generally speaking, certainly not in any of these regulations, that focuses primarily on judicial action as opposed to non-judicial action. So they have concocted this out of whole cloth. And so the idea that there's somehow this vast intergovernmental immunities problem that arises only when the state acts through its custodial sheet that doesn't exist when it acts through its title sheet seems to me a distinction without a difference and not a basis on which there's any argument that there's intergovernmental immunity. There's so much money at stake here, why not just take title? Don't these six states have it within their power just to take the next step and move from a custodial situation to a title holder situation? Well, we don't have title statutes, and I don't think any of the six states involved in this particular case, but most of the states don't have title of sheet. They move to custodial of sheet, and the reason, of course, is that they want to hold on to the property for the benefit of the individuals involved, the bond holders. They're not taking it for the purpose of having the money only available to the state going forward. What happens if the bond holders don't show up for 30 years? You have to think they'll never show up. Well, to be sure, there's some risk of that. But the one thing that's pretty clear is that there is no federal sheet law, so it's not supposed to end up in the United States' hands. And the United States' interest in this money seems to me is without question preeminent, paramount, up to the point when it has gone to maturity. And after maturity and some reasonable period thereafter when the state laws come into play, it's no longer the primary concern of the federal government. The problem I see with that is they've defined the rights in perpetuity, and there's obviously a self-interest in that definition. They're making billions of dollars on paper that are unclaimed, $16 billion. Nobody knows for sure because we didn't have the opportunity for discovery in this case. New Jersey is telling us that if three years lapse, we're going to deem it abandoned, but the federal treasury regulations say that this is held in perpetuity. So if my father was given a bond in 1950 by his mother and he bequeaths it to me in his will, then 10 years from now, if I'm still around, I can walk in and redeem that. Right, to be sure. But New Jersey says no. New Jersey says, well, that thing has long since been abandoned once it reached maturity in 1980. And then the period of the sheet. But it's not as though the money disappears at that point. And indeed, from your perspective, it wouldn't make any difference. And unfortunately, again, this is because this went off on a motion to dismiss, and so we didn't have an opportunity for discovery. But the truth is I think the vast majority of bonds are collected at banks and credit unions. So you take your bond and you give it to your bank. So from your perspective, it makes no difference whatsoever because the bank's going to honor it. Then the only question is who's going to pay the bank? Is it going to be the United States Treasury or is it going to be the state of New Jersey? I think a lot of people used to hold savings bonds long past maturity that were accruing interest. Right, but certain bonds did accrue interest. Unfortunately, the Series E bonds in this case and the regulation that the government keeps quoting up to the point that's really relevant where it talks about how you're allowed to keep them past maturity, that provision goes on because this is a delegation of authority to the secretary that says the secretary may adopt regulations that allow them to keep it past maturity and to provide them with interest. But the secretary never adopted any regulation for these particular bonds. So, in fact, they continue to lose value over time. And I don't think there's any serious question in this case. That is, between the state and the federal government, which is more likely to actually get the money in the hands of the bondholders? And that has to be the ultimate objective that Congress has in mind in this case because it's undisputed, at least in the record as I stand here today, that New Jersey and the other states will make a concerted effort to try to find the bondholders, whereas the United States has never made an effort to find the bondholders and purports never to want to make any effort to find the bondholders. Let me ask you this question. Could you discuss the tension between our circuit's notion of the federal government's beneficial interest in treasury monies, in the case, in remonies, and the rationale and the underpinning in Bowser? Can you talk about that? Yeah, I mean, I think this circuit has adopted the correct interpretation. I think the – I mean, I don't think there's any question that if you view the way In re Deposited Monies analyzes this, it says it's not direct regulation unless it's the United States money, and it's not the United States money, and therefore you pass the intergovernmental immunities problem. I would hope if you want to – I mean, it seems to me that the statements in the D.C. circuit and Bowser were frankly unnecessary in the decision because the court had a much narrower and frankly more persuasive basis for going off on specific preemption theory that focused on having created those trusts under these circumstances and therefore make them – to create an easier opportunity for the people to get paid in those particular situations. That seems to me a federal objective that you can make a better argument about preemption on. In New Jersey, ultimately, won't the state seek title to the bonds? No, we don't seek title to the bonds. All we do is hold them potentially in perpetuity. How about other property in the state? I used to be the chancery judge in Trenton, and I signed hundreds of mischief orders, I think. I think those are real property. And the state, I think, ended up owning them and selling them. Well, I think what you were talking about is real property as opposed to personal and intangible property. So it depends on what the property is as to whether the state seeks title. Right, but that to me makes the government's concession that title insurance is fine. We have no – or title insurance. Title of sheet is fine. We're perfectly comfortable with that. Why does the state want to do this? Because why is the state so benevolent? Well, I might suggest that the history shows that 75 percent is unclaimed, right? You're still – your batting average is 25 percent better than the federal government. Right. It appears happy to keep 100 percent of the people's money. Right, but if we could – but if we – you know, the federal government is clearly at 100 percent. It's not going to change. But the truth is we would be just as happy if it went down to – if we could get it all reclaimed, because that just means that all of our citizens have more wealth than they would have otherwise had. So there is that – I mean, there's a self-interest of benevolence in there, and obviously there's the true self-interest that the state likely will have some of those funds not claimed, and as a consequence will get the benefit of them for the foreseeable future. But if we rule in your favor and then I go to my bank, New Jersey is going to have to pay the bank. Yes. Right, but the bank is going to pay you. But New Jersey is broke, and California is even more broke. And, you know, maybe I would rather have the United States on the hook, because at least the United States, in debt as much as it is, has the power to print me the currency that I can put into my pocket, whereas the state of New Jersey doesn't have that power. Yeah, Judge Hardiman, that would be, to my mind, an extraordinarily speculative basis on which to preempt any state law, much less one that has the historic richness of the Ashik statutes. And also, while I won't argue with you about the relative creditworthiness of states versus the federal government, I do think it's fair to say that no state has ever defaulted under any of these circumstances, and I think it's quite unrealistic to think that they would. No, but doesn't it show that there's a real significance here? We're not talking about some sort of a ledger transfer. We're talking about taking funds that right now is in the or a contract right, the other side of the savings bond transaction that is possessed by the United States government right now and transferring that right to the state government. So there is a real tension here that would seem to invoke the intergovernmental immunity. Well, but I think the better way to think about the problem is, obviously, there is a contract relationship between the bondholders and the United States, and we're frankly not interfering with that in any direct sense, because they say that people don't go to the United States to redeem these things. They just go to the bank and they get them paid. And all the state is trying to do is to regulate in the benefit of the state citizens and property that is in the hands of the, you know, that is the property of its citizens. The state wins this case with escrow money? No, it will keep it in the treasury. It doesn't create a separate escrow account. It's part of the general fund. Right, right. So it's a de facto escrow because of the people. Well, I mean, we're clearly on the hook for it. Maybe in theory they may have to cough up some, but in general. Right, the expectation is. It's cheated. Well, it's not going to be titled as cheated. It's going to end up in the hands of the state, to be sure. I don't know exactly how much. That's what it's going to be. Well, as I understand it, at least, there is no mechanism by which they do that. They will hold the money in perpetuity so that if you show up 150, if your heirs show up 150 years from now. Money in perpetuity, you mean hold the obligation to pay the money. They're not going to hold it up like a lawyer in New Jersey. No, no, to be sure. When a real estate deals, got to stick it in a trust account. Right. There's no question about that. The last point I'd just like to make with respect to the whole question of preemption, because it seems to me it should frame the way the court analyzes this issue, is that there are 91 statutes in which Congress expressly preempts state a sheet laws, including unclaimed property from U.S. taxes. It is difficult for me to imagine a more federal role than holding on to unclaimed taxes. And yet, Congress felt the need to pass a statute in that context, which seems to me to cast serious doubt on the notion that there's an intergovernmental immunities problem and undercuts completely the basis for seeking out implied preemption when it's clear that Congress could have and has obviously decided not to follow express preemption. In the law, at least, it didn't include savings bonds. It doesn't include savings bonds. But why isn't that the other side of the coin of their argument that, well, this law was attempted to be passed that would have given you what you wanted and it wasn't? Yeah, but that statute would have changed everything. That wasn't just savings bonds. That was all property, unclaimed property. Isn't the point the same that the powers that be in Washington regularly instruct us not to read too much into inaction? Except, I mean, I agree with that. Taking no action is one thing. Passing 91 statutes that deal with essentially the entire waterfront of unclaimed property held by the federal government and ignore $16 billion seems to me not an oversight. It seems to me that has to have been a conscious choice that Congress chose not to do that. When were the 91 statutes passed? They've been enacted over the course of the last 15, 20 years. And the $16 billion has only shown up in the relatively recent past. Well, not really. I mean, maturities would have hit in and then the three, five-year periods would have hit. So those have been around 15, 20 years. It's only become evident to the states recently. Well, maybe their need for it became more evident recently. The $16 billion, I couldn't help but think of Everett Dirksen.  Starts to add up. I hear you, Your Honor. Pretty soon you'll get a building name after you. Unless there are other questions. We'll hear you back in rebuttal, Mr. Phillips. Ms. Kline. May it please the Court. Alisa Kline for the United States. The U.S. Savings Bond Program is a federal program, long established. A savings bond is a contract between the United States and the registered owner of the bond, and the terms are governed by federal law, including the federal regulation. The Supreme Court has repeatedly so held, Free v. Bland, Chandler v. United States. The regulations particularly relevant here, which we've quoted in our brief, provide that savings bonds are not transferable and are payable only to the owners named on the bonds, except as specifically provided in these regulations, and then only in the manner and to the extent so provided. That's 31 CFR 315.15. And then the only exception, this is in the federal regulations relevant here, states that the Department of the Treasury will recognize a claim against an owner of a savings bond and conflicting claims of ownership of a bond if established by valid judicial proceedings, but only as specifically provided in this subpart, and then there's a cross-reference to the evidence that you need to establish a valid judicial decree. This regulation, which, you know, has been implemented for all of time, protects the United States Treasury from having to pay twice on a bond. These are not bearer bonds. Why is that, though? I mean, address what opposing counsel said. I mean, you go to the bank to cash in your bond and you get paid once, and the bank will figure out whether the state pays, reimburses it, or the federal government. No, by statute, the secretary can authorize banks to make payment on the bonds, and those banks then have a right to reimbursement from the U.S. Treasury. The banks, you know, they get the money from us, and if also a bond owner can go to Treasury and redeem a bond, and if she chooses to do so and we refuse to pay, and she sues us in the court of federal claims, we will owe the money. This is why, in 1952, the secretary of the treasurer advised... Well, you'll implead the state and say, we already paid it, it was already deemed abandoned under the state of sheet law, and now the state owes the money. Well, no, the Supreme Court has held that the federal contract is governed by federal law. The Supreme Court, the court of federal claims, the federal circuit, will have no interest in New Jersey law. They'll say, this bond is pledged on the credit of the United States. There's no expiration date. You committed to pay the debts of the United States, and you, United States, have to pay the debts. So you had a deal with the person who bought the bond, and what you did with New Jersey is between you two. Go figure it out. That's your concern. You're claiming that's a... It's not an invented concern. It's not an invented concern, and it's the reason the plaintiffs in the district court said, don't worry, we'll indemnify you, because Treasury, the secretary repeatedly underscored that double payments are inevitable. When Congress looked at the Orrin Hatch proposal in 1989, Treasury said, double payments are inevitable. The Office of Management and Budget said, this is just a backdoor, and run around the appropriations process to transfer money to the states, and both said the administrative costs alone of trying to track all of these payments to states and seek reimbursement would be, at the time, $23 million, and given the small dollar amounts for each of the bonds, it would be crazy to spend that kind of money. So, and just like, relating it back to the principles that actually govern here, and the plaintiffs have the presumption backwards. The Supreme Court has repeatedly said, if you're trying to regulate us, which is exactly what they're doing here, they want us to send them the money. That's the, in JA31, the footnote in the district court opinion, when the judge said to the plaintiffs, what do you want? They said they want the defendants, us, to send them, you know, billions of dollars, along with all sorts of information, and that, like, as the D.C. Circuit said, how could you get more core than telling us to send money out of the general federal treasury to plaintiff states? That's, you know, the money is federal money. That's what the D.C. Circuit unanimously said. That's what the Supreme Court said in Buchanan in 1846. This has never been in dispute. Another principle never in dispute is that the Appropriations Clause does not permit the United States to pay money out of the federal treasury absent an affirmative federal law authorization. That includes the implementing regulations. The Supreme Court has repeatedly so held. But here, the regulation I started with, we pay the registered owner, or under the exception, an owner who gets title through valid judicial proceedings. That may be a state through a sheet if it gets title. It may be, you know, upon death an inheritance dispute, but that's it. So when I die intestate and I've got, you know, $10,000 in savings bonds, very generous grandparents, then the state walks into court, gets title because I'm under the intestacy laws, and then you would pay the money over to the state. I'm assuming, you know, no errors, because there are regulations that govern what happens upon death, but assuming that... I thought that's what intestate meant, but... No, intestate is just without a will. Okay, without errors, without... Exactly, if there's no one else who would inherit and the state can establish through judicial proceedings, and this requires due process, you know, ownership, can obtain ownership, then we only pay once. We pay the state, just like if you had, sometimes you have errors with conflicting ownership claims, and again, that has to be resolved through judicial proceedings, valid judicial proceedings that satisfy due process, and that way we only pay once. And, you know, this has been the case, this is why the secretary said this in 1952 to the Comptroller of New York. It's that, you know, if you want us to pay you money from the federal treasury that's owed on a bond, you have to get ownership, and if you don't, don't come saying we just want custody. Custody is totally different. The state wants to act like they're us. They want to assume our debt obligations, and, you know, the debts of the United States under the Constitution are paid by the United States. They want their citizens to get the money that's owed to them, and why is, I don't understand why the treasury is so unsolicitous of the rightful property rights of these bondholders. I mean, why, you know, I can get on the Pennsylvania website right now and type in on this, probably on this iPad, type in my name, and Pennsylvania will tell me in a second whether I have any unclaimed property. Why doesn't the treasury do this for all the citizens with respect to these bonds? We do, and I'm going to answer Your Honor's question, but I also want to make quite clear that as the D.C. Circuit said, even if states thought we were doing a bad job, that does not give them authority to take over a federal program, so just with that marker, however, the characterization is totally wrong. Understand, you know, these bonds have very long terms, 30 years, some of them 40 years, and so it's no surprise that you might have billions of dollars of matured, unredeemed bonds at any point in time. People don't rush in to redeem their, you know, $75 bond. I thought they stopped accruing interest in 1980. No, no. There were bonds that were issued in 1980. Those didn't mature for 30 years. But didn't some of them, weren't some of them issued in 1950? Yes, some were, but their statistic in their brief, the 16 billion, that's just, if you read their complaint carefully, that's just the number of matured, unredeemed bonds. They could have matured yesterday, they could have matured two years ago. When Congress looked at this in 1989, and we cite, we quote this in our brief, the GAO reporting what Treasury statistics said that Treasury got claims of $7,000 to $10,000 every day on bonds that had matured many years earlier, reflecting what is not surprising, that people don't necessarily rush to the bank the day that... Right, well, tell us, just edify this as to how the citizen finds out whether he or she has any matured bonds. For bonds that were issued after 1974, there's a website. You go to Treasury Direct, the link is in our brief, and there's a place where it says, check if you own any matured savings bonds, and you put your name in. All right, what about bonds from 50 to 74? Before, and this is discussed in the GAO report, the problem is that it was all paper records transferred to microfiche. The address information is extremely old, and they didn't have Social Security numbers, so it just would have been incredibly costly to put the pre-'74 records into the database. Don't they have the names? I thought these issue in the names of the bond beneficiaries. But again, the cost of going through the pre-'74 records and putting them into the database, you know, Congress looked at this, no one concluded this was a good use of federal resources. We don't have any... The plane of statistic about the billions of dollars, again, remember, that's just currently matured, unredeemed bonds. All right, well, let's assume it's only $1 billion instead of $16 billion. I mean, it's not that expensive to hire a person to go type in the names of every person they find, right? If Congress or the Secretary conclude that that should be done, obviously that's a judgment for the federal government. Well, they shouldn't, and they're concluding not to do it because they'd rather keep the people's money. Well, again, this is just... And New Jersey's telling us that they are in a fit of really moisonary intent. They want to get the people their money back so they can continue to pay New Jersey taxes. Yes, let me explain what New Jersey and the other states would actually do. And, you know, if you look at their own complaint, they acknowledge this address information could be half a century old. It has no connection to where the people live now. The people could have died, and the bonds have been inherited. The idea that posting this in the county newspaper is going to in any meaningful way connect the people with their money is ludicrous. But your point, I presume, is that this isn't about the most efficient way to find out where these fawn holders are, that that's really either a red herring or at best a side issue. Correct. So let me get back to a couple of things that your adversary talked about and maybe you can help us out on. The whole 702 waiver, is there a concession by the government that it doesn't apply exclusively to APA claims? Within this circuit, we acknowledge that it extends to claims brought under 1331, federal question jurisdiction. That's also in the D.C. circuit. That's the law there, too. Other circuits take a narrower view. No court has held that it applies to state law claims. The theoretical justification for taking that sentence of 702 and kind of pulling it out of context, ignoring the sentence that's before it, is that this was intended to codify the pre-APA Larson and Dugan doctrine, which allowed people to sue a federal official and essentially bring an ultra-virase action, saying that your actions are not authorized or consistent with federal law. It's kind of the parallel to the Ex Parte Young action when you're talking about state officials. That never existed on state law claims, and they cite no case that concludes that this sentence pulled out of its paragraph could then allow suit on a state law claim. Let me ask you something. The district court thought that this action was barred by sovereign immunity and said so. And I couldn't understand why the district court believed that. Justice Scalia about 15 years ago in the case Steele Co. said that once the court determines it doesn't have jurisdiction, which it wouldn't if it was sovereign immunity, the court's only function is to state the point and dismiss the case. So at that point, shouldn't she have just thrown it out? That's an excellent question, and we did look at it because ordinarily we do make Steele Co. arguments and say you need to reach jurisdictional questions first. But in this circuit, in Your Honor's Bowers decision, Bowers v. NAACP from 2003, I think there have been a series of Bowers decisions, the court concluded that the Steele Co. order of operations extends only to limits on Article III jurisdiction and that it did not encompass Eleventh Amendment jurisdiction. And so just based on the reasoning, we didn't think that we could come and say the court must reach sovereign immunity first and may only reach that issue. And here the underlying reason that there's no waiver of sovereign immunity is very close to the intergovernmental immunity merits issue because it's no surprise that Congress didn't waive immunity from state law claims because we are not subject to state law regulation. It's not just that we're not subject to suit on state law claims. The Supreme Court has repeatedly held that absent unmistakable affirmative authorization by Congress, the federal government, our operations, our property, are not subject to state regulation. I just want to read one quote that makes this clear. The Supreme Court has said it many times, but this from the Goodyear decision, 486 U.S. at 180 Note 1. It's a 1988 decision. It was talking about the Ohio Supreme Court, but it said the Ohio Supreme Court in this case failed to consider the fundamental distinction between state regulation of private facilities and state regulation of federal facilities. When dealing with state regulation of private facilities, analysis under the Supremacy Clause centers on whether Congress has taken affirmative action to preempt state regulation in question, citing Hillsborough. On the other hand, because the Supremacy Clause immunizes the activities of the federal government from state interference, direct state regulation of federal facilities is allowed only to the extent that Congress has clearly authorized the regulation. Here, not only do we have no authorization of state regulation of the federal U.S. savings bond program, Congress actually looked at a proposal very similar to this and did not enact it. Let me ask you about Standard Oil. I'm sorry. Standard Oil. Do you think or do you view Standard Oil as an impediment to your preemption in intergovernmental arguments? Well, Standard Oil, largely for the reasons I was saying, has nothing to do with this case. That was a private company, and there's no doubt that states regulate private companies incorporated within their borders or doing business within their borders. As the District Court observed, the rationale of Standard Oil is particularly inapplicable here because the theory was as between a private company having a windfall of unclaimed property and a state, better that the money be put to the public good, the state. But here, the money, this is just, they're seeking general federal treasury money. It's being used for the public good. Isn't the general good on both sides of the V here, though? I'm sorry. I said, isn't the general good, which I think was the language, right, for the general good, isn't it on both sides of the V here? Well, in the relevant sense, it's only on our side because Congress authorized the Secretary of the Treasury with approval of the President to sell these bonds in order to raise money for federal operations. If New Jersey wants money for New Jersey operations, it issues bonds, and whatever credit it has, it'll have to pay interest accordingly. These are pledged on the credit of the United States under Article I, Section 8, Clause 1, and that's the end of it. This is just a wholly federal program, Supreme Court, free versus bland. Of course it's governed by federal law. The only reasons the state, the state comes into it all is because we have a federal regulation that says if someone through valid judicial proceedings establishes ownership, we'll pay them. But it doesn't turn on the state label. It's just if they comply with the regulation, then we will pay them just like we'll pay a private person. Well, let me ask you this. If preemption is absent here, is it also true that intergovernmental immunity doesn't apply if we find that preemption is absent here? Well, as in the D.C. Circuit case, their claims fail regardless of which rubric. It's clearly preempted because the regulations require us to pay the bond owner upon physical surrender of the bond. And that's... If they're trying to extinguish the right of the bond owner to come to us or our designated paying agent, our bank, and say, you know, here's my bond, pay me the money, that's preempted. They can't do that. They can't extinguish our obligation. During the Second World War, the United States sold savings stamps. The savings stamps, money was worth more, could be accumulated in $18.75, accumulated in which event you could get a $25 bond. Many of those stamps undoubtedly were lost and never converted. Who's got the money? It would be the United States. Well, it's discussed in the district court transcript. These weren't about savings stamps in particular, but there were patriotic U.S. savings bond burning parties during World War II. The idea being I'm making this a gift to the United States, not New Jersey, the United States. So the consequence, if there were lost funds that, you know, unless Congress provides otherwise, then the funds remain in the federal treasury and they're used for the public good generally, not for, you know, any particular state operation. You made a statement a moment ago that the states can't extinguish the government's obligation. I think that was the line before you were distracted. Correct, yes. Why is that? Because this is a federal contract, and as the Supreme Court said in Free versus Bland here, I'll just quote it. It's like federal law, of course, governs the nature of the obligations under the bonds. This is also what the federal circuit and courts within the federal circuit have held. So the obligation and the contract incorporates the regulations. That's also long established. So if we pledge to pay the registered bond owner upon surrender of the bond, we have to do that. That's just federal law. It's governed by the federal statute and the federal regulations, and the Court of Federal Claims is not going to look to Kentucky law or Missouri law or, you know, New Jersey law, which, by the way, are different in their provisions, and then say, no, United States, you're off the hook. And again, this is a point that the Secretary of the Treasury made in 1952 in saying, explaining to the New York comptroller why we only pay if a state establishes ownership through judicial proceedings. I don't have any more questions. Just one more. Could you just briefly tell us how it works in the states where, I guess it's a minority of states where they do take title? Are you familiar with that? I am. If a state, I mean, I'll just give the concrete context, the way this would really happen, and I think it's reflected, I can't remember if it's in the New York letter, the 1952 letter, or the 1983 letter to Kentucky, but basically if you had, you know, a state hospital and a patient dies while in the hospital and the state ends up with physical possession of the bonds and can't find an heir, doesn't know what to do, you know, with these bonds, that's actually the scenario. They'd come up and they'd say to us, will you pay us? And we'll say, go, you know, get through your proceedings, get a declaration through a court of ownership, and then we'll pay you. So that's if they actually, like I accept plaintiff's representation that states no longer do that, but that is how it is. It's cost prohibitive, I guess, right? I can ask Mr. Flint. It might be. I'm not sure why they don't do it. But, again, from our perspective, you know, that's their judgment. If they establish ownership, and, of course, they have to show real abandonment, not, you know, you missed the one-year window that New Jersey law provided after the 30 years passed. So in a strange way, this very complicated case, from your perspective, boils down to the very simple proposition. You have a contract with someone. You owe them the money. You're going to pay them the money when they show up and demand the money. And if they're not there, if their rightful heir shows up and demands the money, you pay them. Exactly. End of story. Exactly. Okay. Thank you. Rebuttal, Mr. Phillips? We're going to give you some – we gave Ms. Klein extra time, so don't feel like you're stuck to the three minutes. But gravity is appreciated. I appreciate that, Your Honor. Let me start with where you just ended, which is the simple story. And the simple story is the United States is not subject to dual liability here. Under Section 315.74E4, it says, point blank, under the heading liability, the United States is not liable to any person for the improper distribution of payments or savings bonds, period. And these regulations are incorporated into the savings bonds. It's part of the contract. So if they end up, in fact, giving it to the wrong person, they're not liable under those circumstances. So the notion that they face double liability has been a rent herring since it was originally adopted. Okay, so fast forward. This case goes back to the district court. You have your trial. You win. Now you've got the long list. You're trying to find the people. You find them. You're going to indemnify the government when the banks, who've already paid on some of the people you've found, turn to the government and say, okay, pay me? Yes, of course. We've already agreed to do that. There's no question about that. And we would do that with other states. We do that under any circumstances in which we sheet. And Judge Greenberg, I think I misspoke when I said that we hold these in general funds. In fact, 25% of the monies under these circumstances are held in a separate escrow account for all time. So it's not complete. There is a separate fund to that extent. With respect to Section 702, I just asked the court to read the language of it. It says that there is a complete waiver of sovereign immunity in any circumstance in which you're in a court of the United States with a claim not for money damages, period. There's no distinction that's made along these grounds. And the truth is, if you look at these sheet laws and how they operate vis-à-vis the federal program here, there's a very solid argument for suggesting that either as a Tenth Amendment matter or as a matter of federal common law that the sheet rule would be the rule of federal common law that would apply and be a basis for the state's action in these circumstances in any event. It's interesting to me that Ms. Klein focuses as much as she does on Bauscher and says nothing about NRA monies deposited because the language in NRA monies deposited is directly on point. The United States has no beneficial interest therein but holds the money as statutory trustee for the rightful owners when and if they are determined by the court. And what party was at issue in that case? Well, I mean the claim of the United States because those were monies in the bankruptcy court. Those were bankruptcy court monies that had gone into the U.S. Treasury. So they're being held by the U.S. Treasury. As beneficial owner or as custodian? As custodian in the same way that there are custodians here. Aren't they in a middle ground here? They don't quite own the money because they have the obligation to pay it to the person that shows up and demands it, but they're not mere custodians here, are they? I think once you get past the period of maturation of the bonds, the United States is doing nothing but holding them. I mean if all 16 billion claimants, obviously there are not that many of them, but if all $16 billion worth of claims showed up tomorrow, they would hand out every nickel of that money. And that's not going to happen in the end of the federal government scheme. There's at least some chance of it happening in the state scheme. I suppose your adversary's point is, yeah, that's right. That's what our contract calls for. And if they show up, we give it to them. And when they came with their money in 35 or 45 or 55, that's the deal that they wanted. Federal government, we want to give you some money with the promise that you're going to give us interest and that we're going to get back whatever we give you at some point in time, I, my heirs, whomever. Yeah, but I guess I would have thought that the better way to think about this, if you're analyzing this as a preemption question, is which of these two regimes is most likely to encourage somebody in the future to buy more bonds from the United States? One in which after the fact the United States takes no interest in identifying you and trying to get the money in your hands or a system in which the states affirmatively attempt to get money in your hands. It seems to me there is no conflict. Well, that might explain. That can't be the dynamic, right? That's a good explanation for why 10 years ago they sold $10 billion and last year they sold $1 billion, right? They're not doing a great job selling these things. It's a bad deal. Or maybe people don't want to hazard the risk of losing the thing and being out of luck. I mean, I think that's. That sheds the light on. No, but that is the free versus bland inquiry. I mean, that's exactly what the court said is. What is the overall objective of Congress? And in that context it said the overall objective of Congress is to be in a position where it is creditworthy and will sell more bonds. And in that case state law interfered with that. I submit to you that state law will promote that and facilitate that. The other thing about their. Do you want to be their partner on savings bonds now? We can work collaboratively. Well, I mean, and the truth is, and you ask about the title, you know, part of the problem is we don't have the names. I mean, they don't make those names available to the states. At a minimum it would be nice in the first instance if they simply gave us the names. And that's part of the relief we've asked for is the names and the addresses of these people. We'll worry about the money. We can worry about the money down the road, although I don't think there's any ultimate obstacle to that. The other thing I just want to comment generally, you know, in the analysis of how many bonds have been redeemed and how all this has played out between 1941 and 1980, remember there was no opportunity for any discovery. So all of that is pure speculation about what, if any, imposition or obstacles that this is going to create for the federal government. That's all purely speculative, and it seems to me in a world of preemption where you're supposed to respect state law, particularly where the Supreme Court has told you you have to respect the sheet laws, that's not enough under these circumstances. The case should be remanded back to the district court. So no more questions? Thank you, Your Honor. Thank you, Mr. Phillips. Thank you, Ms. Kline. The case was expertly argued by both sides, and we'll take the matter under advisement.